KEASLER v. WRAY et al.   (No. 1255.)

(Court of Civil Appeals of Texas. Texarkana. Nov. 5, 1914.)

1. MARSHALING ASSETS AND SECURITIES (§ 1*) —NATURE AND SCOPE OF REMEDY.

The doctrine of marshaling assets will not be applied in favor of a party whose equities are inferior to that of others claiming the same securities.

[Ed. Note.—For other cases, see Marshaling Assets and Securities, Cent. Dig. § 1; Dec. Dig. § 1.*]

2. CHATTEL MORTGAGES (§ 225*) — SALE OF PROPERTY — CONSENT OF MORTGAGEE — RIGHTS OF JUNIOR MORTGAGEE.

By a sale of a part of mortgaged chattels with the mortgagee's consent, but without waiving lien, neither the mortgagee nor mortgagor injured or displaced any right of a junior mortgagee in respect to the security acquired under a mortgage made thereafter on the property not sold.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 468–470; Dec. Dig. § 225.*]

3. CHATTEL MORTGAGES (§ 225*)—SALE OF PROPERTY—CONSENT OF MORTGAGEE—TITLE AND RIGHT OF BUYERS.

Where a mortgagee of chattels consents to a sale of a part thereof, but without waiving lien, the buyers may require the mortgagee to first exhaust the lien on the remaining property before having recourse to the property sold, and, if that is sufficient to satisfy the debt, they become the absolute owners free from the lien.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 468–470; Dec. Dig. § 225.*]

4. MARSHALING ASSETS AND SECURITIES (§ 2*) —CLAIM FOUNDED ON CONTRACT.

Taking a junior mortgage on the remainder after a sale of a part of mortgaged chattels with the senior mortgagee's consent would not so far overcome the prior equities of the buyers, as to compel marshaling in favor of the junior mortgagee against them, for marshaling is not founded on contract, nor is it a vested right or lien, but rests on equitable principles.

[Ed. Note.—For other cases, see Marshaling Assets and Securities, Cent. Dig. § 1; Dec. Dig. § 2.*]

5. MARSHALING ASSETS AND SECURITIES (§ 4*) —CLAIMS IN HANDS OF ONE PERSON.

A junior mortgagee, who took a mortgage on the remainder after a sale of a part of mort-

gaged chattels, with the senior mortgagee's consent, but without waiving lien, and who later took an assignment of the senior mortgage, being the holder of both claims, could not invoke the doctrine of marshaling securities as against the equities of the buyers.

[Ed. Note.—For other cases, see Marshaling Assets and Securities, Cent. Dig. § 4; Dec. Dig. § 4.*]

**6. PAYMENT (§ 39*) — APPLICATION OF PAYMENTS.**

The application of a payment as intended and agreed cannot be diverted without the debtor's consent.

[Ed. Note.—For other cases, see Payment, Cent. Dig. §§ 104–114; Dec. Dig. § 39.*]

**7. CHATTEL MORTGAGES (§ 210*)—PAYMENT OF DEBT—APPLICATION BETWEEN MORTGAGES.**

Where mortgaged property is turned over to the mortgagee to apply the proceeds on the mortgage debt, a junior mortgagee, who acquires the property with notice thereof, on taking an assignment of the debt and senior mortgage, must apply the proceeds accordingly to discharge the debt secured by the senior mortgage.

[Ed. Note.—For other cases, see Chattel Mortgages, Dec. Dig. § 210.*]

Appeal from District Court, Cass County; H. F. O'Neal, Judge.

Suit by T. B. Keasler against C. P. Wray and others to recover on notes, and for other relief. From a judgment for defendants, plaintiff appeals. Affirmed.

On November 2, 1911, C. P. Wray, as principal, and T. E. Wray, as surety, executed to the First National Bank of Hughes Springs ten promissory notes. As a further security in the payment of the notes, C. P. Wray on November 4, 1911, executed a mortgage to the bank on seven mules, two wagons and harness, and a shingle mill and its machinery and usual attachments. On April 29, 1912, C. P. Wray, as principal, and T. J. Wilson, as surety, executed to the bank a note for $132.50 due 30 days after date, and this note was by agreement secured by the mortgage of November 4, 1911. In June, 1912, C. P. Wray by permission of the cashier of the bank made sale of the shingle mill and its machinery and usual attachments to A. B. Bennett and A. H. Wiley. At the time of the sale of the shingle mill and outfit to Bennett and Wiley, the first six of the series of ten promissory notes had been paid to the bank, and there were four of the series unpaid, but only one of the four was yet due besides the note for $132.50. The cashier at the time of granting permission to sell the shingle mill stated that the bank "would not waive its mortgage, but there was sufficient property to pay them without the shingle mill." On June 15, 1912, after the sale of the shingle mill to Wiley and Bennett, C. P. Wray executed to T. B. Keasler a note for $640.12 and secured the same by a second mortgage on the seven mules, two wagons, and harness described in the first mortgage. On August 6, 1912, about two months after C. P. Wray had sold the shingle mill and outfit to Wiley

and Bennett, the appellee C. P. Wray turned over to the bank the seven mules, two wagons, and harness covered by the mortgage, together with two notes for $100 each, for the purpose of having sale made of the property, the notes collected, and 'the proceeds arising therefrom to be applied to the payment of the five notes mentioned above. At the same time, Wray turned over to the bank as a payment a credit in his favor at the bank of $38. Four of the five notes were due and payable at the time the property was turned over to the bank for sale; the note for $132.50 having a credit payment thereon of $86.70. After the property was turned over to the bank to pay the indebtedness, and about August 14, 1912, T. B. Keasler, without the knowledge of C. P. Wray or his sureties, or Wiley and Bennett, bought of the bank the five notes held and owned by it, and had said notes and mortgage assigned to him by the bank. After T. B. Keasler came into the possession of the property through delivery by the bank to him, he sold some of the property, and bartered some, and realized out of all the property the net sum of $901. Out of the sum realized from the sale of the property the appellant applied the same first to his own debt and then on the notes purchased from the bank, leaving a balance due on the bank notes. Appellant brought the suit to recover on the notes purchased from the bank against the makers and the sureties and to foreclose the first mortgage, and against A. B. Bennett and A. H. Wiley for the value of the shingle mill and outfit alleged to have been converted by them. The defendants answered that the property sold by the plaintiff had been turned over by C. P. Wray to the bank to be sold and collected and the proceeds to be applied to the payment of the bank debt, and that the proceeds should have been applied by the plaintiff first to the bank debt. The defendants Bennett and Wiley answered that the shingle mill and outfit were sold to them by permission of the bank, which held the mortgage; that the second mortgage did not embrace the property; and that they had the right to have the mortgage as originally executed to the bank exhausted on all of the property and first applied to payment of the bank debt. C. P. Wray further claimed that the property was more than sufficient to pay both the debt of the bank and of the plaintiff, and prayed for judgment over and against plaintiff for $501. The case was tried to the court without a jury, and he made findings of fact and conclusions of law, and entered judgment for the defendants. The findings of fact are not challenged, and are substantially given above.

Henderson & Bolin, of Daingerfield, and Mahaffey, Thomas & Hughes, of Texarkana, for appellant. O'Neal & Allday, of Atlanta, for appellees.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

LEVY, J. (after stating the facts as above). The court pronounced the legal effect of the facts found by him to exist to be in denial of the right of the plaintiff to have a judgment against the defendants in the suit. The appellant insists by his two assignments of error that the court did not give the proper legal effect to the facts found to exist. Appellant insists that, holding as he did the debt of the bank as well as that of his own with the several securities given for the payment of each, he has the right to have the securities for the payment of either debt marshaled in such manner as to most fully protect him. Concluding as we do that the court's decision should be sustained, we overrule the two assignments.

[1] It is believed that under the facts the appellant could not claim the benefit nor invoke the rule of marshaling securities. The equities of the defendants in point of fact are found by the court to be superior to that of appellant, and this would be sufficient to deny the application of the doctrine in favor of appellant.

[2] It appears from the facts that the property covered by the mortgage to the bank covered mules, wagons, and a shingle mill and its attachments. The mortgage subsequently given to the appellee covered the same mules and wagons, but did not cover the shingle mill and attachments. The first mortgage was executed November 4, 1911. About June 6, 1912, and when about one-half of the indebtedness that the mortgage was given to secure was paid, the mortgagor sold by permission of the bank the shingle mill and attachments covered by the mortgage to Wiley and Bennett. It would be required to presume, in support of the court's judgment, that about June 6, 1912, the shingle mill sale was effected, for the court finds that "about two months after the shingle mill had been sold the defendants A. P. Bennett and A. H. Wiley and C. P. Wray turned over to the First National Bank of Hughes Springs, Tex.," the property mortgaged, and the evidence is without dispute that the date the property was turned over to the bank was August 6, 1912. The appellant's mortgage was executed June 15, 1912. Therefore at the time of the sale of the shingle mill neither the bank nor the mortgagor injured or displaced any right of the appellant in respect to the security. The appellant at the time of the sale stood towards the transaction as any other stranger would do having no rights therein.

[3] But rights arose in favor of Wiley and Bennett in regard to the security covered by the mortgage, which must be taken into account and considered, as the court did, as a right next to the lien of the bank. Acquiring the property by permission of the bank, and at a time that no junior mortgage existed against any of the property and when sufficient of the original indebtedness

had been reduced by payment to leave the value of the mules and wagons more than sufficient, as a fact, to pay off the balance due, Wiley and Bennett would be in an equitable position to require of the bank, had it undertaken to satisfy its existing debt under the mortgage, that it first exhaust its lien upon the personalty covered by the mortgage before having recourse to the shingle mill. This would be so for the reason that the permitted sale of the property operated as an equitable limitation upon the remedy of the bank to disturb the rights of Wiley and Bennett further and to a greater extent than to apply the shingle mill to the satisfaction of the indebtedness existing, failing the sufficiency of the remaining personalty to satisfy same. If the other property was sufficient to pay the existing original indebtedness, as was the proof here, then, as against both the mortgagor and the bank, Wiley and Bennett would have become the absolute owners of the shingle mill free from the mortgage lien of the bank.

[4] In order to displace and defeat this equitable situation of Wiley and Bennett against the bank in respect to the shingle mill, the appellant has to rely alone upon the fact that he was a junior lienor upon the mules, and that subsequently on August 14, 1912, he became the purchaser of the bank of the existing indebtedness and the mortgage. The fact of taking a junior mortgage, being after the sale to Wiley and Bennett, would not so far overcome the prior equities of Wiley and Bennett as to compel marshaling in favor of appellant against Wiley and Bennett, for marshaling is not founded on contracts, nor is it a vested right or lien, but rests on equitable principles alone. 26 Cyc. 928; 6 Pomeroy's Equity Jur. 867.

[5] By subsequently purchasing the bank's debt and security, appellant was not in a better position to invoke, as against the equities of Bennett and Hill, the benefit of the doctrine sought to have applied. He in fact was in the position then of one person having two claims against another person. Being in that position, appellant could not invoke the doctrine of marshaling securities, for the rule is not applicable when the two claims are in the hands of the same person. In order to obtain the relief, "the parties must be creditors of the same debtor, and both funds must belong to one debtor." 3 Pomeroy's Eq. Jur. 868.

[6, 7] And neither was there error in concluding, as involved in the court's conclusion, that appellant by his subsequent purchase of the bank's debt and lien was not entitled, under the facts, to be protected by substitution or subrogation under the mortgage. The court finds:

"That about two months after the shingle mill had been sold by defendant C. P. Wray to defendants Wiley and Bennett, C. P. Wray turned over to the First National Bank of Hughes Springs, Tex., the seven mules, two

wagons, seven sets of harness, also two notes for $100, and a credit at the bank of $38 for the purpose of said personal property being sold by the said bank and the said notes being collected and the proceeds thereof to be applied to the payment of the five notes executed by said C. P. Wray and others to said bank, which notes are described in the bank mortgage, and being the five notes sued on herein." And "I find that, after said property had been turned over to the said First National Bank of Hughes Springs to pay said indebtedness, the plaintiff, without knowledge of the defendants herein, bought from the bank the five notes held by it, being the five notes described in the plaintiff's petition and the five notes sued on herein, and had said notes and said mortgage to said bank assigned to him by the First National Bank of Hughes Springs."

After the appellee came into the possession of the property, he, as found by the court, "sold some of the property and bartered the balance, and realized out of all the property the net sum of $901." Finding, as the court did, that C. P. Wray, the debtor, directed the manner in which his payment was to be applied, and that the bank accepted and undertook to make appropriation as directed and intended by the debtor, Wray, the bank would have to apply it accordingly. The application of the payment as intended and agreed cannot ·be diverted without the consent of the debtor. Taking the property and acquiring the debt with notice, as the court was authorized to find, of the intention and agreement to make application of the proceeds of the property to the bank's debt, the appellant could take no position inconsistent with the application of the payments in the particular way. The court therefore may, at the instance of the debtor, enforce, as he did, the appropriation of the funds ˙under the agreement of the bank to the discharge of the specified debt, and in so doing the debt would appear, according to the evidence, fully discharged. As the debt of the bank was fully discharged by applying the payment as directed and agreed, the mortgage would be released, and as a consequence the maker of the note, the sureties, and Wiley and Bennett would be discharged. The effect of the court's conclusion was this result, and should be sustained.

The judgment is affirmed.